# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL DRELICH, MICHAEL INCAVO and ROGER SMITH, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BMW OF NORTH AMERICA, LLC, <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Daniel Drelich, Michael Incavo, and Roger Smith ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Class Action Complaint against Defendant BMW of North America, LLC ("BMW" or the "Defendant").

## NATURE OF THE ACTION

1.      Plaintiffs bring this action on behalf of themselves and on behalf of all similarly situated persons in the United States who purchased or leased BMW branded vehicles that had telematics systems rendered wholly or partially inoperable due to the sunsetting of 3G services in the affected BMW vehicles (the "Class Vehicles" or

"Vehicles").[1]

2.      As alleged herein, the Class Vehicles have a telematics system that requires wireless network connectivity to remain wholly operable. However, due to Defendant's decision to equip the Class Vehicles with obsolete telematics equipment, many of the Class Vehicles' internet enabled features—such as collision notification and roadside assistance safety features—have become inoperable because the Class Vehicles' internet enabled features no longer are supported due to the discontinuation of 3G networks in the Vehicles.

3.      The decision by Defendant to cut 3G connectivity will have stark financial consequences for the class members. Additionally, it spells the loss of certain 3G-dependent safety features during vehicle operation. This poses a significant safety hazard to drivers and occupants of Class Vehicles, and other members of the public, because disconnecting 3G compatibility has now "bricked" important safety features in the Class Vehicles.

4.      This result is the consequence of Defendant's decision to equip Class Vehicles with telematics equipment—the proper functioning of which was contingent

---

[1]      At this time, Plaintiffs do not know the exact models and model years of BMW vehicles that are impacted by BMW's conduct. On information and belief, Plaintiffs allege that all BMW vehicle models from model years 2009-2018 are impacted. Plaintiffs reserve the right to modify the vehicles comprising the Class Vehicles as the case proceeds through discovery.

upon continued viability of 3G services—that inevitably and foreseeably became obsolete.

5.      Defendant is and has been aware of the risks of equipping the Class Vehicles with telematics equipment that rely upon 3G wireless services to operate. Nevertheless, Defendant designed and produced the Class Vehicles with telematics equipment that they knew would soon be obsolete.

6.      Prior to selling the Class Vehicles, Defendant knew that the operability of the telematics equipment installed in the Class Vehicles hinged on the availability of 3G services.

7.      Making matters worse, now that the telematics equipment is obsolete, when owners and lessees of the Class Vehicles seek an upgrade of the telematics equipment to maintain the roadside emergency safety features and other features available through ConnectedDrive/BMW Assist services ("CD/BMWA"), they often find that there is no remedy or available upgrades do not work.

8.      The Class Vehicles' internet enabled features and services, such as emergency safety features and other features available through CD/BMWA, were rendered inoperable because of the 3G phase out in 2022 due to Defendant's installation of obsolete telematics equipment in the Class Vehicles.

9.      The telematics systems in Class Vehicles no longer adequately function, and Defendant omitted information about the inevitable and premature termination of

internet-enabled services offered in Class Vehicles at the time of sale.

10. Because of Defendant's decision to equip the Class Vehicles with internet enabled features and services that prematurely become inoperable and its refusal to upgrade Class Vehicles to maintain telematics capabilities, Plaintiffs and class members are unable to utilize their Vehicles' telematics equipment and its safety features.

11. As a result of Defendant's misconduct, Plaintiffs and class members have been damaged and were injured on account of receiving Vehicles that were fundamentally different from what they believed they were purchasing and obtained Vehicles that are less valuable than what they paid to purchase the Vehicles.

12. This action is brought to remedy violations of law in connection with Defendant's manufacture, marketing, advertising, selling, warranting, and servicing of the Class Vehicles.

13. On behalf of the putative class members, Plaintiffs bring claims for breaches of implied warranty and unjust enrichment. On behalf of the New Jersey Class, Plaintiff Drelich brings claims for fraudulent omission and violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*

14. The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d)(2)(A) because this matter was brought as a class action under Fed. R. Civ. P. 23, at least one proposed class member is of diverse citizenship from Defendant, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), excluding interest and costs.

16.     The Court has personal jurisdiction over Defendant and venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this District, Defendant's principal place of business is in this District, and Defendant conducts substantial business in this District.

17.     At all pertinent times, Defendant was engaged in the marketing, advertisement, sale, and lease of the Class Vehicles, which are the subject of this lawsuit, in this District and throughout the United States.

## PARTIES

**Plaintiffs**

### *Plaintiff Daniel Drelich*

18.     Plaintiff Daniel Drelich is an adult citizen of Cherry Hill, New Jersey. In 2015, Plaintiff Drelich purchased a certified pre-owned 2014 BMW i3 REx, from

Holman BMW of Mount Laurel, an authorized BMW dealership in New Jersey. Plaintiff uses his Class Vehicle for family and household use.

19.     Plaintiff Drelich decided to purchase BMW i3 REx partly due to the features offered by CD/BMWA, such as navigation, real traffic, remote services, including remote climate control, and several safety and emergency features. At the time of his purchase, the vehicle had approximately 9 more years of CD/BMWA subscription.

20.     In 2021, Plaintiff Drelich received an email and/or a letter from Defendant informing him that his vehicle would stop supporting the functions of the CD/BMWA sometime in February 2022, due to the decommissioning of 3G infrastructures.

21.     In or around February 2022, Plaintiff Drelich lost the ability to utilize the features of CD/BMWA.

22.     At the time of purchasing his Vehicle, Plaintiff Drelich did not know that his Vehicle was equipped with a 3G modem that would prematurely fail and cause internet enabled features and services to become inoperable. Had Defendant disclosed this on its website, through its dealerships, in its warranty manuals, or elsewhere prior to Plaintiff Drelich purchasing his Class Vehicle, Plaintiff Drelich would not have purchased his Vehicle, or would not have paid the purchase price that he did. Plaintiff relied upon Defendant to provide the full picture of information regarding his Vehicle

and relied upon the idea that Defendant would not withhold material information about the Vehicle. As a result, Plaintiff received less than what he paid for his Vehicle and did not receive the benefit of his bargain.

### *Plaintiff Michael Incavo*

23.     Michael Incavo is an adult citizen of The Woodlands, Texas. In or around January 2021, Plaintiff purchased a used 2017 BMW i3 REx, from Austin e Autos in Round Rock, Texas. Plaintiff Incavo uses his Class Vehicle for family and household use.

24.     Plaintiff Incavo decided to purchase BMW i3 REx partly due to the features offered by CD/BMWA, such as navigation, remote services, including remote climate control, battery temperature preconditioning for increased range, vehicle locator, and several safety and emergency features. At the time of his purchase, the vehicle had approximately 6 more years of CD/BMWA subscription.

25.     Sometime in 2021, Plaintiff Incavo learned from online forums that other i3 owners and lessees were receiving letters or emails from BMW notifying them of the forthcoming termination of internet enabled services.

26.     In or around February 2022, Plaintiff Incavo lost the ability to utilize the features of CD/BMWA. Subsequently, Plaintiff Incavo called BMW customer support line and visited his local dealership to inquire about available updates that would enable the operability of CD/BMWA features in his vehicle. Plaintiff Incavo was

informed by representatives in each instance that his vehicle was not eligible for an upgrade that would allow his vehicle to continue providing internet enabled services.

27.    At the time of purchasing his Vehicle, Plaintiff Incavo did not know that his Vehicle was equipped with a 3G modem that would prematurely fail and cause internet enabled features and services to become inoperable. Had Defendant disclosed this on its website, through its dealerships, in its warranty manuals, or elsewhere prior to Plaintiff Incavo purchasing his Class Vehicle, Plaintiff Incavo would not have purchased his Vehicle, or would not have paid the purchase price that he did. Plaintiff Incavo relied upon Defendant to provide the full picture of information regarding his Vehicle and relied upon the idea that Defendant would not withhold material information about the Vehicle. As a result, Plaintiff Incavo received less than what he paid for his Vehicle and did not receive the benefit of his bargain.

### Plaintiff Roger Smith

28.    Plaintiff Roger Smith is an adult citizen of Oviedo, Florida. In or around June 2019, Plaintiff purchased a used BMW i3 from a local used car dealership in Florida. Plaintiff Smith uses his Class Vehicle for family and household use.

29.    Plaintiff Smith decided to purchase a BMW i3 partly due to the features offered by CD/BMWA, such as Remote Services, and several safety features. At the time of his purchase, the vehicle had approximately 6 more years of CD/BMWA subscription.

30. Plaintiff Smith has received a letter from Defendant informing him that his vehicle would stop supporting the functions of the CD/BMWA sometime in February 2022, due to the decommissioning of 3G infrastructures.

31. Soon after receiving the notification letter, Plaintiff Smith called CD/BMWA Customer Service Line to inquire about any available upgrades to his vehicle's modem so he can continue using the features of CD/BMWA, or, in the alternative, to receive $50 per year for the CD/BMWA services he can no longer utilize until the end of his already existing subscription running through 2025. However, he was told that there was nothing that BMW could do.

32. In or around February 2022, Plaintiff Smith lost use of CD/BMWA's functions.

33. At the time of purchasing his Vehicle, Plaintiff Smith did not know that the Vehicle was equipped with a 3G modem that would prematurely fail and cause internet enabled features and services to become inoperable. Had Defendant disclosed this issue on its website, through its dealership, in its warranty manuals, or elsewhere prior to Plaintiff Smith purchasing his Class Vehicle, Plaintiff Smith would not have purchased the Vehicle, or would not have paid the purchase price that he did. Plaintiff Smith relied upon Defendant that it was providing the full picture of information regarding his Vehicle and relied upon the idea that Defendant would not withhold material information about safety concerns in the Vehicle. As a result, Plaintiff Smith

received less than what he paid for his Vehicle and did not receive the benefit of his bargain.

**Defendant**

34. Defendant BMW of North America LLC is a Delaware corporation with a principal place of business at 300 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677. Defendant has sold and leased, and continues to sell and lease, vehicles to consumers throughout the United States. Defendant designed, manufactured, marketed, distributed, leased, and sold, through its authorized dealers, distributors, and other agents, the Vehicles in the United States to Plaintiffs and the other class members.

35. Defendant's warranty manuals for the vehicle make no mention of the fact that Defendant installed an inferior 3G modem in their Vehicles. At the time of their vehicle purchases, Plaintiffs were not informed by Defendant that their Vehicles were equipped with 3G modems. 3G modems were not disclosed by Defendant's authorized dealerships, on Vehicles' window stickers, or elsewhere at the time Plaintiffs purchased their Vehicles.

## FACTUAL BACKGROUND

### A. BMW IN THE UNITED STATES

36. BMW vehicles officially entered the United States market in 1956. In 1975, BMW of North America, LLC was established as the United States importer of

BMW vehicles.[2] In 1994, BMW started operating its first manufacturing plant in the United States.[3]

37. In 2020 and 2021, BMW-branded vehicle sales in the United States totaled 278,732 and 336,644, respectively.

## B. OVERVIEW OF INTERNET-ENABLED SERVICES IN BMW VEHICLES

38. BMW started equipping vehicles with an emergency call function as early as 1996. In 1999, GPS system was introduced in cars and, in 2004, SIM cards entered the first BMW cars. BMW Assist was introduced in 1998 and offered features for increased convenience and enhanced safety.[4]

39. Beginning with the introduction of the BMW Remote app in 2013, followed by the BMW Connected app, BMW started offering connectivity between

---

[2] *Company Information*, BMW, https://www.bmwusa.com/about/bmw-of-north-america.html (last accessed on Nov. 22, 2022).

[3] *Chronology*, BMW Group, https://www.bmwgroup.com/en/company/history.html (last accessed on Nov. 22, 2022).

[4] *Connected Car. Its history, stages and terms.* BMW, https://www.bmw.com/en/innovation/connected-car.html (last accessed on Nov. 10, 2022).

mobile devices and its vehicles.[5] On March 31, 2021, the latest My BMW App was released.[6]

40.     BMW states that "BMW ConnectedDrive seamlessly integrates your mobile devices, smart home technology, and your vehicle's intelligent interfaces into a complete driver's environment."[7]

41.     The My BMW App uses the vehicle's onboard wireless module, or modem, to communicate with BMW's cloud service through cellular technology. The My BMW App facilitates remote services, including starting, locking/unlocking, locating the vehicle, viewing current mileage, and checking window and door status. The My BMW App also provides navigation and safety features, such as parking

---

[5]     *Your World. My BMW. The new-generation app for BMW customers. Now available in 30 European markets, China and Korea*, BMW Group (Mar. 12, 2020), https://www.press.bmwgroup.com/global/article/detail/T0321612EN/your-world-my-bmw-the-new-generation-app-for-bmw-customers-now-available-in-30-european-markets-china-and-korea?language=en#:~:text=Ever%20since%20the%20introduction%20of,between%20their%20smartphone%20and%20vehicle.

[6]     *BMW connects customers with new My BMW App*, BMW Group (Mar. 3, 2021), https://www.press.bmwgroup.com/usa/article/detail/T0328879EN_US/bmw-connects-customers-with-new-my-bmw-app?language=en_US#:~:text=The%20My%20BMW%20App%20will,to%20be%20activated%20remotely%20(incl.

[7]     *BMW Connected Drive*, BMW, https://www.bmwusa.com/explore/connecteddrive.html (last accessed Nov. 28, 2022).

locator, map syncing, roadside assistance, identifying nearby dealerships, BMW Assist eCall, and BMW Support.[8]

42.    For electric vehicles, BMW's internet enabled features allow owners and lessees to check the vehicle's battery charge level and total range, set a route to compatible charging stations, and to schedule the time of day the vehicle charges its battery in order to take advantage of when electricity prices are at their lowest.[9]

43.    In 2008, BMW contracted with AT&T to obtain access to its 3G network for the modems installed in the Class Vehicles.[10]

44.    AT&T first introduced 3G in 2006-2007. This was followed by the launch of its 4G LTE service on September 18, 2011. Then, in February 2019, AT&T publicly announced a plan to sunset their 3G wireless network to make way for its deployment of its 5G network.

45.    The modems in Class Vehicles are critical to the operation of CD/BMWA, which provide critical safety functions that include, among others, BMW eCall and Roadside Assistance.

---

[8]    *The My BMW App*, BMW.com, https://www.bmwusa.com/my-bmw-app.html (last accessed on Nov. 10, 2022).

[9]    *Id.*

[10]    *AT&T Renews Multi-Year Exclusive Connected Car Agreement*, AT&T.com (Jan. 5, 2016), https://about.att.com/story/att_renews_exclusive_connected_car_agreement.html.

## C. SUNSETTING OF THE 3G NETWORK IN BMW VEHICLES

46. Manufacturers of 3G devices have long known that 3G would be phased out eventually. In January 2008, the FCC auction for 700 MHZ spectrum began with Version Wireless and AT&T winning the biggest share after having stated their intentions to support LTE a/k/a 4G LTE. Automakers, like Defendant, were aware of this too.

47. The sunsetting of 3G was long foreseeable. As mobile carriers seek to upgrade their networks to use the latest technologies, they periodically shut down older outdated services, such as 3G, to free up spectrum and infrastructure to support new services, such as 5G. Similar transitions have happened before. For example, some mobile carriers shut down their 2G networks when they upgraded their networks to support 4G services. Mobile carriers have the flexibility to choose the types of technologies and services they deploy, including when they decommission older services in favor of newer services to meet consumer demands.

48. Despite the inevitability of the 3G functionality in the Vehicles being decommissioned, and the public announcement of the timetable in February 2019, BMW continued to manufacture the Class Vehicles with a 3G modem. Accordingly, BMW knew or should have known when it manufactured each of the Class Vehicles that the 3G capabilities in each of them would become useless before the end of the

usable life of the Class Vehicle and/or while the Class Vehicles were still under warranty.

**D. BMW ANNOUNCES THE END OF 3G CONNECTIVITY IN THE CLASS VEHICLES**

49.     In 2021, Defendant started to notify the owners or lessees of Class Vehicles of the termination of several key features provided by CD/BMWA.

50.     Many recipients of Defendant's email/letter were also informed that there was no technology upgrade available that would allow them to continue using CD/BMWA services beyond February 2022.

51.     On April 22, 2021, BMW updated the FAQ page on its website and outlined the services that will be affected by the discontinuation of 3G cellular technology, as depicted below[11]:

---

[11]     *Frequently Asked Questions: 3G Cellular Technology Discontinuation* (Apr. 22, 2021), https://www.bmwusa.com/content/dam/bmwusa/common/connected-drive/pdf/3G_FAQ.pdf.



FREQUENTLY ASKED QUESTIONS:
3G CELLULAR TECHNOLOGY
DISCONTINUATION.

The **Ultimate** Driving Machine®

Last Updated: April 22, 2021

The upcoming discontinuation of 3G cellular technology will impact our BMW ConnectedDrive/BMW Assist services offering.

Customers with active BMW Connected/BMW Assist contracts that are affected will be notified via email or First-Class Mail.

1. **Why is it no longer possible to renew ConnectedDrive/BMW Assist services for my vehicle?**
   Due to a phasing out of the 3G network by cellular carriers, ConnectedDrive services can no longer be supported starting February 2022 for select vehicles. The decision to phase out 3G network technology was made at the discretion of the respective cellular carriers and lies beyond the control of BMW.

   BMW is in the process of assessing options to ensure that BMW ConnectedDrive/BMW Assist renewals are only sold within the timeframe that services can be supported. Currently, service renewals are not possible, as they are sold for one-year terms. For customers who had one or more ConnectedDrive services expiring between February 2021 – February 2022, a complimentary Connected Package Professional or BMW Assist Safety Plan subscription was automatically activated for their BMW vehicle until February 1, 2022. Such a vehicle will receive all services within the Connected Package Professional or BMW Assist Safety Plan that it is technically capable of receiving. Please note that not all services may be available due to optional equipment required (e.g., Navigation is required for Advanced Real-Time Traffic Information).

   To ensure customers receive the complimentary services, they will need to "Update Services" via iDrive. Depending on the vehicle, this is done by selecting "Apps" > "All Apps" > Press "Options" button > "Update apps and services", or ConnectedDrive > Press "Options" button > "Update BMW Assist." If after performing this update services are unavailable , please contact BMW Assist Customer Care at 1-888-333-6118 or customercare@bmwassist.com.

2. **What services are affected?**
   As a result of the sunset of 3G service by wireless carrier partners, by February 2022, vehicles factory-equipped with 3G telematics devices or retrofitted 2G vehicles will no longer be able to receive any ConnectedDrive/BMW Assist services.

Some vehicles factory-equipped with 4G telematics devices will no longer have access to services that require a voice connection, such as BMW Assist eCall and Concierge Services, but will continue to receive certain ConnectedDrive/BMW Assist services such as Advanced Real-Time Traffic Information, Remote Services and BMW Online, depending on your BMW model.

3. **My original contract for ConnectedDrive/BMW Assist services expires after February 1, 2022. How will this change affect me?**
You will receive additional information from BMW. Some vehicles may be eligible for a technology upgrade to maintain functionality.

4. **My contract for ConnectedDrive/BMW Assist services is active but expires before February 1, 2022. Will I be able to use my services until then?**
If you currently have an active ConnectedDrive/BMW Assist contract that expires in or after February 2022, your services will continue to work until February 2022.

For customers who had one or more ConnectedDrive services expiring between February 2021 – February 2022, a complimentary Connected Package Professional or BMW Assist Safety Plan subscription was automatically activated for their BMW vehicle until February 1, 2022. Such a vehicle will receive all services within the Connected Package Professional or BMW Assist Safety Plan that it is technically capable of receiving. Please note that not all services may be available due to optional equipment required (e.g., Navigation is required for Advanced Real-Time Traffic Information).

To ensure customers receive the complimentary services, they will need to "Update Services" via iDrive. Depending on the vehicle, this is done by selecting "Apps" > "All Apps" > Press "Options" button > "Update apps and services", or ConnectedDrive > Press "Options" button > "Update BMW Assist." If after performing this update   services are unavailable, please contact BMW Assist Customer Care at 1-888-333-6118 or   customercare@bmwassist.com.

Customers affected by this 3G cellular technology discontinuation are unable to purchase or renew services. To ensure that BMW ConnectedDrive/BMW Assist renewals are only sold within the timeframe that services can be supported, BMW has stopped selling one-year service renewals as of February 1, 2021. This was done proactively so that renewal service contracts would not extend beyond February 2022.

5. **Can a customer upgrade their vehicle to newer technology that would support ConnectedDrive/BMW Assist?**
Not all BMW vehicles will be eligible for a technology upgrade. Customers will be notified via email or First-Class Mail about whether their vehicles are eligible for an upgrade or not.

6. **I received a notice that my vehicle is eligible for a technology upgrade. What are my next steps?**
If you received an email or postal mailing stating that your vehicle is eligible for a technology upgrade, please schedule an appointment with your local BMW Center to receive the upgrade, which will be free of charge.

52.     The FAQ page notes that "[d]ue to a phasing out of the 3G network by cellular carriers, ConnectedDrive services can no longer be supported starting February 2022 for select vehicles."[12]

53.     Despite its advanced knowledge of the inevitability of the 3G infrastructure and its ability to plan upgrades for Class Vehicles with that foresight, Defendant claims that "[t]he decision to phase out 3G network technology was made at the discretion of the respective cellular carriers and lies beyond the control of BMW."[13]

54.     Defendant installed 3G capable telematics systems in Class Vehicles that could not be upgraded or adapted to next generations of wireless technology. Within the mobile connectivity industry, a generation typically refers to a fundamental improvement in the nature of the wireless network, which may involve different frequency bands, higher peak bit rates, or non-backwards compatible transmission technology.

55.     The FAQ page indicates that "Not all BMW vehicles will be eligible for a technology upgrade. Customers will be notified via email or First-Class Mail about whether their vehicles are eligible for an upgrade or not."[14]

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

### E. AS A RESULT OF THE SUNSETTING OF 3G NETWORK, VEHICLE SAFETY FEATURES ARE RENDERED UNUSABLE

56. Class Vehicles' critical safety features and accompanying CD/BMWA services use the vehicles' onboard wireless module, or modem, to communicate with the secure cloud services through cellular technology.

57. CD/BMWA allows users to start, lock, unlock, and locate the vehicle remotely. CD/BMWA also connects users with other vehicle resources like a parking locator, roadside assistance, and dealer locations.

58. The internet-enabled telematics systems on Class Vehicles provide crucial safety features to expedite medical assistance in cases of emergency with BMW Assist eCall, roadside assistance, and remote vehicle locator. In recognition of the importance of the theft and safety features, most insurance carriers offer vehicle owners preferential rates for vehicles with such safety features.

59. For electric vehicles, CD/BMWA allows owners and lessees to check the vehicle's battery charge level and total range, and to schedule the time of day the vehicle charges its battery in order to take advantage of when electricity prices are at their lowest.

60. Due to the termination of services that provide critical safety features, Plaintiffs and class members are stripped of safety measures and precautions.

61. Defendant refused to make available a 4G upgrade kit installation as a warranty repair or otherwise cover all costs associated with the upgrade of the 3G

modem for Class Vehicles. As a result of Defendant's misconduct, Plaintiffs and the other class members were each injured on account of receiving Class Vehicles that were fundamentally different from what they believed they were purchasing, less valuable than was represented, and less valuable than what they actually received.

## TOLLING OF STATUTES OF LIMITATIONS

62.     Defendant had exclusive knowledge of the nature of the Class Vehicles' 3G modems, i.e., that numerous features would cease operating when 3G networks were decommissioned, and Defendant knew that this planned phasing out would not be discovered by Plaintiffs and class members unless and until the disconnection occurred. Only Defendant had access to information about the decision to decommission the 3G network, including through communications with cellular providers regarding the eventual decommissioning of its 3G network, and Defendant's general knowledge of the telecommunications industry's upgrade to 4G and 5G technology.

63.     Since Plaintiffs could not have learned of the planned phasing out of the 3G network until the 3G network was decommissioned, Plaintiffs and class members exercising due diligence were not reasonably able to discover the issue until after purchasing the Class Vehicles. Plaintiffs and class members could not reasonably have been expected to learn of or discover Defendant's omissions of material information concerning the Class Vehicles until after the phaseout was announced and only then

because they would be forced to research what had happened to their Vehicles. Therefore, the discovery rule applies to all claims asserted by Plaintiffs and class members.

64. Defendant has known about this issue since at least 2016 when cellular service providers began making announcements regarding sunsetting of their 3G network, if not earlier, and has failed to alert class members.

65. Thus, any applicable statute of limitations is tolled by Defendant's actions and Defendant is estopped from pleading the statute of limitations because it failed to disclose facts it was obligated to disclose.

<b><u>CLASS ALLEGATIONS</u></b>

66. This action is brought as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the class(es) defined as follows:

**<u>Nationwide Class</u>**
All persons and entities in the United States that purchased or leased a Class Vehicle for end use and not for resale.

67. In the alternative, Plaintiffs seek certification of the following classes:

**<u>New Jersey Class</u>**
All persons and entities in the state of New Jersey that purchased or leased a Class Vehicle for end use and not for resale.

**<u>Texas Class</u>**
All persons and entities in the state of Texas that purchased or leased a Class Vehicle for end use and not for resale.

**Florida Class**
All persons and entities in the state of Florida that purchased or leased a Class Vehicle for end use and not for resale.

68.     Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, authorized distributors and dealers, (ii) all class members who timely and validly request exclusion from the Class, and (iii) the Judge presiding over this action.

69.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

70.     **Numerosity:** The members of the Class are so numerous that joinder of all class members in a single proceeding would be impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that tens of thousands of Class Vehicles affected by the issues alleged herein have been sold and leased nationwide.

71.     **Existence/Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all class members and predominate over

questions affecting only individual class members. Such common questions of law or fact include, *inter alia*:

a.   whether Defendant engaged in the conduct alleged herein;

b.   whether Defendant omitted and misrepresented material facts to purchasers and lessees of Class Vehicles;

c.   whether Defendant's omissions and misrepresentations regarding the Class Vehicles were likely to mislead a reasonable consumer;

d.   whether Defendant breached warranties with Plaintiffs and the other class members when they produced, distributed, and sold the Class Vehicles;

e.   whether Plaintiffs' and the other class members' Class Vehicles were worth less than as represented as a result of the conduct alleged herein;

f.   whether Plaintiffs and the other class members have been damaged and, if so, the extent of such damages; and

g.   whether Plaintiffs and the other class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

72.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other

class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

73. **Typicality:** Plaintiffs' claims are typical of the claims of the other class members because, among other things, Plaintiffs and the other class members were injured through the substantially uniform misconduct described above. Like Plaintiffs, class members also purchased or leased Class Vehicles containing planned-to-be-obsolete telematics systems. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other class members, and no defense is available to Defendant that are unique to Plaintiffs. The same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all class members. Plaintiffs and all class members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct in selling/leasing and failing to remedy the Class Vehicles with telematics systems that would be phased out.

74. **Adequacy:** Plaintiffs are adequate Class representatives because they will fairly represent the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including consumer fraud and automobile defect class action cases. Plaintiffs and their counsel are

committed to prosecuting this action vigorously on behalf of the Class they represent and have the resources to do so. Neither Plaintiffs nor their counsel have interests adverse or antagonistic to those of the Class.

75. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and the other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for class members to individually seek redress for Defendant's wrongful conduct. Even if class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

76. Upon information and belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) Defendant maintains regarding its sales and leases of Class Vehicles.

## COUNT I
## Breach of Implied Warranty of Merchantability
### (On Behalf of Plaintiffs and the Classes)

77. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

78. This claim is brought by Plaintiffs on behalf of the Nationwide Class and the New Jersey, Texas, and Florida Classes.

79. Defendant is and was at all relevant times a merchant with respect to the Class Vehicles, and manufactured, distributed, warranted and sold the Class Vehicles.

80. A warranty that the Class Vehicles, and their telematics equipment, were in merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

81. Plaintiffs and the other class members purchased the Class Vehicles manufactured and sold by Defendant in consumer transactions.

82. The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition, did not meet a minimum standard of quality, and were not fit for the ordinary purpose for which cars with installed telematics equipment are used because the inevitable decommissioning of the 3G networks would render the vehicle modem nonfunctional. The Class Vehicles left Defendant's possession and control with a modem of such a quality that rendered the Vehicles unmerchantable and unfit for ordinary use. Plaintiffs and the other class members used their Class Vehicles in

the normal and ordinary manner for which Class Vehicles were designed and advertised.

83.     Defendant knew before the time of sale to Plaintiffs and the other class members, or earlier, that the Class Vehicles were produced with a modem that was unfit for ordinary use and that would be decommissioned, which falls well short of an objective minimum standard of quality. This knowledge was based on Defendant's own knowledge of the decommissioning of 3G network its modems relied on, its decision to include an alternate 4G modem in other vehicle models produced around the same time, the industry standard practice of making vehicle features that would not be affected by the 3G network shutdown, and Defendant's general knowledge regarding the manufacture of its vehicle modems and integrated systems and software.

84.     Plaintiffs' and other class members' modems and the Class Vehicles are, and at all times were, not of fair or average quality, nor would they pass without objection.

85.     All conditions precedent have occurred or been performed.

86.      Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known issue with the 3G modems. Defendant knew when they first made these warranties and their limitations that the issue existed, and the warranties might expire before a reasonable consumer

would notice or observe that the outdated 3G network was decommissioned. Defendant also failed to take necessary actions to adequately disclose or cure the issue after it came to the public's attention and sat on its reasonable opportunity to cure or remedy the problem, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the issue or cure its breaches of warranty.

87. Plaintiffs and the other class members had sufficient direct dealings with Defendant and its agents (dealers) to establish privity of contract between themselves and Defendant. As alleged *supra,* one Plaintiff and numerous class members purchased their Class Vehicles from BMW dealerships. The Class Vehicles were purchased with the New BMW Warranty Coverage. Defendant and Plaintiffs and the other class members are in privity because of the existence of the New BMW Warranty Coverage, which Defendant extend to Plaintiffs and the other class members as end users.

88. Privity, nevertheless, is not required in this case because Plaintiffs and the other class members are intended third-party beneficiaries of the agreements between Defendant and its dealers and the intended beneficiaries of Defendant's warranties. Dealerships are not intended to be the ultimate consumers of the Class Vehicles; warranties are designed for, and intended to benefit, only the ultimate consumers—such as Plaintiffs and the other class members.

89. Plaintiffs and the other class members suffered and will suffer diminution in the value of their Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

## COUNT II
### Fraudulent Omission
### (On Behalf of Plaintiff Drelich
### and the New Jersey Class)

90. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

91. This claim is brought by Plaintiff Drelich on behalf of the Nationwide Class and the New Jersey Class.

92. Defendant knew that the Class Vehicles' modems were equipped with outdated technology that would be rendered useless, would fail, and were not suitable for their intended use, and that this would lead to the failure of key features like those provided by CD/BMWA.

93. Defendant concealed from and failed to disclose to Plaintiff Drelich and class members the true nature of Class Vehicles' modem.

94. Defendant was under a duty to Plaintiff Drelich and class members to disclose the true nature of Class Vehicles' modem because:

- Defendant was in a superior position to know the true state of facts about the Class Vehicles' modem;

- Defendant made partial disclosures about the quality of Class Vehicles without revealing the true nature of the modem; and

- Defendant actively concealed the true nature of the Class Vehicles' modem from Plaintiff and other class members.

95.     The facts concealed or not disclosed by Defendant to Plaintiff Drelich and the other class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Had Plaintiff Drelich and class members known about the true nature of Class Vehicles' modem, i.e., that they would be phased out and decommissioned, they would not have purchased or leased Class Vehicles, or would have paid less for them.

96.     Defendant concealed or failed to disclose the true nature of this issue with the Class Vehicles' modem in order to induce Plaintiff Drelich and class members to purchase or lease Class Vehicles. Plaintiff Drelich and the other class members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff Drelich's and class members' purchase or lease of the Class Vehicles.

97.     As a direct and proximate result of Defendant's misconduct, Plaintiff Drelich and class members have suffered and will continue to suffer actual damages.

**COUNT III**
**Violation of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. § 56:8-1, *et seq.* ("NJCFA")**
**(On Behalf of Plaintiff Drelich and the New Jersey Class)**

98.     Plaintiff Drelich re-alleges and incorporates herein all foregoing factual allegations.

99.     The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2.

100.     Plaintiff Drelich and the New Jersey class members are consumers who purchased and/or leased the Vehicles for personal, family, or household use.

101.     At all relevant times, Defendant conducted trade and commerce in New Jersey within the meaning of the NJCFA.

102.     Defendant violated the NJCFA by engaging in the following deceptive trade practices:

a)     omitting and concealing that the Vehicles and their telematics systems prematurely fail and lose functionality and that BMW would refuse to

ensure proper operability of the Vehicles and their functions, despite knowledge of the foreseeable and inevitable termination of 3G enabled features due to the discontinuation of the 3G infrastructure; and

c)    omitting and concealing that Vehicles were equipped with 3G only telematics systems that would be ineligible for an upgrade, rendering internet enabled services to be terminated, which was known to Defendant prior to sale, as alleged herein.

103.   Plaintiff Drelich and the New Jersey class members reasonably expected that the Vehicles would not prematurely lose internet enabled features, rendering critical services, including safety and emergency services, inoperable. Further, Plaintiff Drelich and the New Jersey class members reasonably expected Defendant to honor its warranty obligations as represented to them at the time they purchased their Vehicles.

104.   Defendant knew, or, in the exercise of diligence, should have known, that the Vehicles were manufactured with an obsolete telematics equipment, prematurely lost critical a safety features upon termination of 3G services, and were not suitable for their intended and/or expected use.

105.   In failing to disclose that the Vehicles were equipped with obsolete telematics equipment, the safety risk posed by the inoperability of internet enabled

features, and the unavailability of upgrade options, Defendant omitted material facts it was under a duty to disclose to Plaintiff Drelich and the New Jersey class members.

106. The injury to consumers by this conduct greatly outweighs any alleged countervailing benefit to consumers or competition under all of the circumstances.

107. Had Plaintiff Drelich and the New Jersey class members known about the obsolete telematics equipment in Vehicles at the time of purchase, including the risks associated with the termination of some of the services, the unavailability of upgrades, or the true effect of Defendant's warranty of the Class Vehicles, they would not have bought the Vehicles or would have paid much less for them.

108. Had Plaintiff Drelich and the New Jersey class members been adequately notified by Defendant about the obsolete telematics system in Vehicles, they would not have purchased or leased the Vehicles or paid as much for them.

109. As a direct and proximate result of Defendant's actions, Plaintiff Drelich and the New Jersey class members have suffered economic damages including, but not limited to, repair costs, loss of use of the Vehicles, substantial losses in value and resale value of the Vehicles, and other damages.

110. Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint within 10 days of filing.

## COUNT IV
## Unjust Enrichment
### (On Behalf of Plaintiffs and the Classes)

111.  Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

112.  This claim is brought by Plaintiffs on behalf of the Nationwide Class and the New Jersey, Texas, and Florida Classes.

113.  This claim is pleaded in the alternative to the other claims pleaded herein.

114.  As described herein, Defendant marketed, distributed, and sold the Class Vehicles, as equipped with internet-enabled safety and other features, without disclosing the truth about the inevitable and foreseeable termination of their operability, namely that the Class Vehicles had telematics equipment that would be "bricked" and rendered useless upon the sunsetting of 3G infrastructure.

115.  As a direct and proximate result of Defendant's omissions concerning the obsolete telematics equipment and refusal to upgrade such equipment, Defendant has profited and benefited from the sale and lease of the Class Vehicles. Although these Vehicles are purchased through Defendant's agents, the money from the Vehicle sales flows directly back to Defendant.

116.  Plaintiffs and class members thus conferred a benefit upon, and thereby enriched, Defendant in exchange for Class Vehicles that are equipped with useless 3G modems.

117.   Defendant has voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendant's misconduct, Plaintiffs and the class members were not receiving products of the quality, nature, fitness, or value that had been represented by Defendant, and that reasonable consumers expected.

118.   As a result of Defendant's unjust enrichment, Plaintiffs and the class members have suffered damages.

119.   Defendant has been unjustly enriched by its fraudulent and deceptive withholding of benefits to Plaintiffs and the Class, at the expense of these parties. Defendant has been unjustly enriched, among other ways, in the amount of the difference in the price of the Class Vehicles with functioning modems and internet enabled safety features, and the price of the Class Vehicles with the disconnected 3G network.

120.   Equity and good conscience militate against allowing Defendant to retain its ill-gotten gains and require disgorgement and restitution of the same.

121.   Plaintiffs and class members are entitled to restitution of the profits unjustly obtained by Defendant, with interest.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.    Certifying the Class under Federal Rule of Civil Procedure 23 as requested herein;

B.    Appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel;

C.    Finding that Defendant engaged in the unlawful conduct as alleged herein;

D.    Awarding Plaintiffs and the other class members actual, compensatory, and consequential damages;

E.    Awarding Plaintiffs and the other class members statutory damages;

F.    Awarding Plaintiffs and the other class members declaratory and injunctive relief;

G.    Awarding Plaintiffs and the other class members restitution and disgorgement;

H.    Awarding Plaintiffs and the other class members exemplary damages, should the finder of fact determine that Defendant acted with malice or oppression;

I.    Awarding Plaintiffs and the other class members pre-judgment and post-judgment interest on all amounts awarded;

J.    Awarding Plaintiffs and the other class members reasonable attorneys' fees, costs, and expenses; and

K.    Granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

Dated:  November 28, 2022

Respectfully submitted,

*/s/ Andrew W. Ferich*
Andrew W. Ferich (NJ Bar No. 015052012)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

Robert R. Ahdoot (*pro hac vice* to be filed)
Bradley K. King (NJ Bar No. 081472013)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
rahdoot@ahdootwolfson.com
bking@ahdootwolfson.com

*Attorneys for Plaintiffs and the Putative Classes*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to L. Civ. R. 11.2, I hereby certify to the best of my knowledge that the matter in controversy is also the subject of the following action pending in this Court:

*Grayson v. BMW of North America LLC, et al.*, No. 2:22-cv-06103-SDW-MAH

Plaintiff:      Peter Grayson

Defendants:  BMW of North America LLC
                    Bayerische Motoren Werke Aktiengesellschaft AG Munich Germany

I further certify that I know of no party, other than putative class members, who should be joined in the action at this time.

Dated: November 28, 2022                     */s/ Andrew W. Ferich*
                                                              Andrew W. Ferich